**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-22183-UU

WILLIAM ATTIX, on behalf of himself
and others similarly situated,

    Plaintiff,
v.

CARRINGTON MORTGAGE SERVS., LLC,

    Defendant.
_____/

**ORDER**

THIS CAUSE is before the Court upon Defendant's Motion Compel Arbitration and to Stay Case (the "Motion to Compel") (D.E. 17) and Defendant's Motion to Stay Discovery Pending Decision on the Motion to Compel (D.E. 18) (the "Motion to Stay Discovery").

THE COURT has considered the Motions, pertinent parts of the record, and is otherwise fully advised in the premises.

**I.**     **Background**

Plaintiff William Attix ("Plaintiff") owns a home that is subject to a mortgage serviced by Carrington Mortgage Services ("Defendant"). D.E. 1 ¶ 5. Plaintiff's putative class action complaint alleges that Defendant engaged in a practice of charging illegal "processing fees" when payments on its mortgages are made online or over the phone. *Id.* Plaintiff's claims are based on one mortgage payment he made to Defendant via an automated phone payment system in May 2020, in which he paid a $10 processing fee for making the payment over the phone. *Id.* ¶ 16.

All payments made via the Defendant's mortgage payment processing service are made through "Speedpay," a payment processing system. D.E. 17-1 at 2 ¶ 5, Declaration of George

1

Saliba.[1] To make such a payment, a customer must enter the last four digits of his Social Security number, consent to a phone payment fee, authorize the debit to his account, and accept the terms and conditions ("T&Cs") associated with the transaction (together, the "Phone Payment Agreement"). *Id.* at 3 ¶¶ 6–7. The automated phone payment transaction process requires the customer to state "I agree" to authorize a total payment that includes the phone payment fee, and requires the customer to select "1" on the phone key pad to accept that "the terms and conditions applicable to this payment are located at Speedpay.com/terms." *Id.* at 3 ¶¶ 8–9. By following these steps and entering into the Phone Payment Agreement, which includes the T&Cs at Speedpay.com/terms, the customer is able to complete the transaction through the automated phone system. *Id.* at 3 ¶ 10.

The T&Cs include a provision to arbitrate "any dispute arising from or relating to" the payment. T&Cs, D.E. 17-1 at 9. Specifically, the "Resolution of Disputes" paragraph provides as follows:

> Unless You opt out . . . **any dispute arising from or relating to Service** or your Payment(s) shall be resolved by mandatory and binding arbitration. The arbitrator shall also decide what is subject to arbitration unless prohibited by law. The arbitration will be administered by American Arbitration Association ("AAA") under its Consumer Arbitration Rules. . . . You will be responsible for up to $200 of the administration fees. We, or the Arbitrator, may reduce this amount if you demonstrate hardship. This agreement is governed by the Federal Arbitration Act 9 U.S.C. § 1 et seq. . . . Any arbitration shall take place on an individual basis; class actions or consolidation of arbitrations are not permitted. . .

*Id.* (the "Arbitration Agreement") (emphasis added). The terms apply to and govern the access and use of "the Service," which is defined as the "payment processing service [] offered to You on behalf of your Biller [Carrington]," including "[p]ayments initiated, or completed through,

---

[1] George Saliba is the Vice President of Loan Servicing Analytics, in which he "review[s] business records kept in the ordinary course of business by Carrington Mortgage Services, LLC." D.E. 17-1 at 1 ¶ 1.

Integrated Voice Response (IVR) [or] telephone . . . ." *Id.* at 6. Under the terms, "access to and use of the Services . . . is governed by the laws of the State of New York." *Id.* at 11.

On May 26, 2020, Plaintiff filed his putative class action complaint, bringing claims of: (1) violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692k(a)(2)(b); (2) violating the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.77(2); (3) violating the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §§ 501.211(2) and 501.2105; (4) breach of contract; and (5) unjust enrichment. D.E. 1. On July 20, 2020, Defendant moved to compel arbitration, arguing that Plaintiff's claim is governed by the Arbitration Agreement. D.E. 17. The Motion is fully briefed and ripe for disposition.

## II.     Legal Standard

The Federal Arbitration Agreement (the "FAA"), 9 U.S.C. §§ 1 et seq., governs this dispute and "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (quotation marks omitted). The Eleventh Circuit has "recognized that the FAA creates a presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014)). "Under the FAA, a written agreement to arbitrate is 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . .' Accordingly, the FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (quoting 9 U.S.C. §§ 2-4). Thus, "[t]he threshold question

3

of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

"[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016). (citation omitted). "A court cannot compel parties to arbitrate their dispute in the absence of clear agreement to do so." *Larsen v. Citibank FSB*, 871 F.3d 1295, 1302 (11th Cir. 2017). Whether an agreement to arbitrate exists is a question of state contract law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995); *Bazemore*, 827 F.3d at 1329–30. "These principles dictate that courts look for evidence that the parties 'objectively revealed an intent to submit the dispute to arbitration.'" *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

"If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. To determine whether the making of the arbitration agreement is in issue, courts apply a summary judgment-like standard. *Bazemore*, 827 F.3d at 1333. Thus, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* (citing Fed. R. Civ. P. 56(a)). The party moving to compel arbitration bears the burden "to prove the existence and terms of the contract it wishes to enforce." *Id.* at 1334.

The United States Supreme Court has made clear that "[l]ike any statutory directive, the [FAA]'s mandate may be overridden by a contrary congressional command." *Shearson/Am. Exp.,*

*Inc. v. McMahon*, 482 U.S. 220, 226 (1987). "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227 (citation, quotation marks, and alterations omitted). The relevant inquiry remains whether Congress "preclude[d] arbitration or other nonjudicial resolution of claims." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 29 (1991). When considering whether a contrary congressional command is present, courts must remember "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id.* at 26. The party opposing arbitration bears the burden of showing whether a congressional command exists. *Id.*

### III. Analysis

Defendant asserts that the Arbitration Agreement must be enforced because there exists a valid agreement to arbitrate given that Plaintiff manifested his assent to enter into the T&Cs with Speedpay, and because the Arbitration Agreement contains a delegation clause that requires an arbitrator to determine whether Plaintiff and Defendant agreed to arbitration.[2] D.E. 17 at 5–9. Plaintiff does not dispute that he manifested his assent to the Arbitration Agreement in the T&Cs. D.E. 25. Rather, Plaintiff argues that there is no valid arbitration agreement because Defendant is not a party to the Arbitration Agreement in the T&Cs, and various contract law principles do not

---

[2] The delegation clause here provides that "[t]he arbitrator shall also decide what is subject to arbitration unless prohibited by law." D.E. 17-1 at 9. When an arbitration agreement contains a delegation clause, the applicability of the arbitration agreement is to be decided by an arbitrator. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). However, arbitrability is for the courts to decide "unless there is clear and unmistakable evidence that the parties intended to submit such questions to an arbitrator." *Compere v. Nusret Miami, LLC*, 396 F. Supp. 3d 1194, 1199 (S.D. Fla. 2019) (citing *JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11th Cir. 2018)). While there is a dispute as to whether Defendant is a party to the arbitration agreement, there is no bona fide dispute as to the scope of the arbitration agreement; therefore, the Court will not consider Defendant's delegation clause argument.

allow Defendant, a nonsignatory,[3] to compel arbitration. D.E. 25 at 8–11. Plaintiff also argues that any attempt to import Speedpay's T&Cs into this dispute to force Plaintiff to arbitrate his claims against his mortgage servicer runs afoul of the Dodd-Frank Act, 15 U.S.C. § 1639c. Defendant replies that it is a party to the Phone Payment Agreement, and, in any event, equitable estoppel allows Defendant to enforce the Arbitration Agreement. D.E. 27.

        A.  <u>There Exists a Valid Agreement to Arbitrate Between Plaintiff and Defendant</u>

Given that Plaintiff does not dispute that he manifested assent to enter into the T&Cs with Speedpay, the Court will turn its attention to the fundamental issue of whether Plaintiff and Defendant entered into an agreement to arbitrate.[4]

        *i.*      *Defendant is a Party to the T&Cs and the Arbitration Agreement*

Plaintiff argues that Defendant cannot compel arbitration because "Defendant is not a party to the arbitration agreement it seeks to enforce and Plaintiff never agreed to arbitrate any claims against Defendant." D.E. 25 at 3. In support of his argument, Plaintiff states that: (1) the only parties referenced in the Arbitration Agreement specifically are "You" (Plaintiff), and "We"

---

[3] Plaintiff uses the terms "party" and "signatory" interchangeably to argue that Defendant is not a party to the Arbitration Agreement or T&Cs. The Court notes that strictly speaking, there are no "signatories" to the electronic T&Cs. However, the T&Cs make clear that Plaintiff's consent is subject to the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001–7006, which provides that "a contract relating to [a] transaction [affecting interstate commerce] may not be denied legal effect, validity, or enforceability solely because an electronic signature or *electronic record* was used in its formation." § 7001(a)(2) (emphasis added); D.E. 17-1 at 14.

[4] Plaintiff asks the Court to apply Florida law, while Defendant asks the Court to apply New York law in accordance with the T&Cs' choice of law provision. D.E. 25 at 7; D.E. 29 at 7. For the reasons set forth herein, because the result would be the same under either law, the Court need not conduct a conflict of law analysis. *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000) (a court need only undertake a conflict of law analysis if a true conflict exists); *O'Connor v. United States Fencing Ass'n*, 260 F. Supp. 2d 545, 553 (E.D.N.Y. 2003) (noting the same under New York law). A false conflict exists when the laws of different states are (1) the same, (2) different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws. 766 So. 2d at 352.

(Speedpay); (2) the Arbitration Agreement makes no reference to "Biller" (Defendant); and (3) the T&Cs' statement in the "Limitation of Liability" paragraph that "Speedpay is not affiliated with the Biller" makes clear that the T&Cs meant to exclude Defendant as a party to the Arbitration Agreement. D.E. 25 at 8; D.E. 17-1 at 9. Defendant replies that it is a party to the Arbitration Agreement and that Plaintiff's "bare denial that an agreement exists is insufficient to avoid arbitration where, as here, the undisputed facts show the existence of a valid arbitration agreement." D.E. 27 at 3.

Defendant is a party to the T&Cs. Defendant, the "Biller," is expressly contemplated on page 1 of the T&Cs, which provides the following:

> This payment processing service is offered to You **on behalf of your Biller** ("Service"). . . . As used in these Terms and Conditions, the term "User" means a user of this Website or any Alternative Payment Channel, located in the U.S, who is making a payment to the Biller. . . . The terms "Speedpay," "we," "our," or "us" refer to Speedpay, [and] its affiliates and parent company who support the Service . . . The term **"Biller"** refers to the **receiver of Your Payment**, which is generally a business that is a client of Speedpay that **has authorized Speedpay to process payments** from its customers. Each payment transaction ("Payment") made through the Service is **a payment to the Biller**. Speedpay solely provides processing services to the **Biller** and is not involved in the administration or collection of Your account, nor is Speedpay involved or associated with the goods and/or services provided by **Biller**. . . . By using the Service, You are requesting to make a **Payment to Your Biller**.

D.E. 17-1 at 6 (emphasis added). "The parties to a contract are the persons who enter the contract and are responsible for its performance." *Party to a Contract*, BOUVIER LAW DICTIONARY (2019). The T&Cs clearly identify the parties: Plaintiff is responsible for making the payment, Defendant is responsible for receiving the payment and applying it against the indebtedness, and Speedpay is responsible for processing the payment. D.E. 17-1 at 6.

Defendant is also a party to the Arbitration Agreement. The fact that the "Biller" was not expressly mentioned in the Arbitration Agreement does not mean it is not a party. The Arbitration

Agreement governs "any dispute arising from or relating to **Service** on your Payments(s)." D.E. 17-1 at 9 (emphasis added). "Service" is defined as the "payment processing service [] offered to You on behalf of your **Biller**." *Id.* at 6 (emphasis added). By referencing the "Service," the Arbitration Agreement thereby references payments to the Biller. Further, the only reference to Speedpay ("we") in the Arbitration Agreement provides that "We . . . may reduce this amount if you demonstrate hardship"; this does not establish that the Arbitration Agreement meant to exclude Defendant as a party. *Id.*

Plaintiff cites to *Calderon v. Sixt Rent a Car LLC*, No. 19-cv-62408-SINGHAL, 2020 WL 700381, at *8 (S.D. Fla. Feb. 12, 2020) to argue that "under the T&Cs' plain, unambiguous language, Carrington is a nonparty." D.E. 25 at 8*; Calderon*, 2020 WL 700381, at *9 (denying defendant's motion to compel arbitration "for a very simple reason: It is not a party to the contract."). The facts in *Calderon* are distinguishable: there, a car rental company, Sixt, sought to enforce the arbitration agreement entered into between the plaintiff and the third-party booking entity, Orbitz. *Calderon*, 2020 WL 700381, at *9. The arbitration agreement provided that "*You and Orbitz* agree that any and all Claims will be resolved by binding arbitration." *Id.* at *9 (emphasis added). Here, the Arbitration Agreement is much broader—governing "any dispute arising from or relating to Service on your Payments(s)"—and does not expressly limit arbitration to certain parties, *i.e.*, Plaintiff and Speedpay. D.E. 17-1 at 9.

        ii.    *Alternatively, Defendant May Compel Arbitration Under Agency Law Principles*

Even if Defendant were not an express party to the Arbitration Agreement, Defendant may compel arbitration because the T&Cs make clear that Speedpay was acting as Defendant's agent.

"Common law principles of contract and agency law allow a signatory to bind a non-

8

signatory to an arbitration agreement." *Bd. of Trs. v. Citigroup Global Mkts., Inc.*, 622 F.3d 1335, 1342 (11th Cir. 2010) (quoting *World Rentals & Sales, LLC v. Volvo Constr. Equip. Rents, Inc.*, 517 F.3d 1240, 1244, 1247 (11th Cir. 2008)); *see also Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) ("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement"); *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 944 (Fla. 1st DCA 2004) ("Florida and federal courts have recognized that a non-signatory can compel arbitration by a signatory to an arbitration agreement when the underlying proceeding concerns actions allegedly taken by the non-signatory as an agent of a signatory."). When acting within the scope of his or her authority "an agent can bind a principal to an arbitration agreement just like any other contract." *Dye v. Tamko Bldg. Prods.*, 275 F. Supp. 3d 1314, 1322 (M.D. Fla. 2017) (citing *Fi-Evergreen Woods LLC v. Estate of Robinson*, 172 So. 3d 493, 497 (Fla. 4th DCA 2015)); *Jefferies & Co., Inc. v. Infinity Equities I, LLC*, 66 A.D.3d 540, 541, 887 N.Y.S.2d 81 (N.Y. App. Div. 2009) ("An agent acting within the scope of its authority may bind a principal to an arbitration agreement.") (citations omitted)).

"Nonsignatories to a[n arbitration agreement may] compel arbitration . . . when, under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted). It follows that a nonsignatory principal may compel arbitration agreed to by its signatory agent so as to avoid "evisceration of the underlying arbitration agreement." *Id.*; *Segersbol v. Celebration Cruise Operator Inc.*, No. 13-60644-CIV-COHN/SELTZER, 2013 U.S. Dist. LEXIS 67750, at *13 (S.D. Fla. May 13, 2013) ("[A]n agency relationship with one of the signatories would allow the

9

principal to compel arbitration.") (citing *Razo v. Nordic Empress Shipping, Ltd.*, No. 07-CV-05745, 2008 U.S. Dist. LEXIS 57618 (D.N.J. July 24, 2008), *aff'd*, 362 F. App'x 243 (3d Cir. 2009)); *Highland HC, LLC v. Scott*, 113 A.D.3d 590, 978 N.Y.S.2d 302 (2014).

Here, in executing the Phone Payment Agreement, Speedpay was acting as Defendant's agent. Plaintiff called Defendant's customer service line and agreed to the T&Cs to make his mortgage payment to Defendant. The T&Cs expressly were referenced as the applicable terms as part of the IVR process, and there can be no question that Plaintiff understood that the purpose of the IVR transaction governed by the T&Cs was to make his mortgage payment to Defendant. The T&Cs at page 1 provides that Speedpay was acting "on behalf of" the Biller, which authorized Speedpay to act as its agent to process payment transactions. D.E. 17-1 at 6. The T&Cs explicitly state that in authorizing the transaction, Plaintiff "[is] requesting to make a Payment to Your Biller." *Id.* Plaintiff does not dispute that Defendant is the "Biller" under the T&Cs. D.E. 25 at 8. Nor does Plaintiff dispute whether he manifested assent to enter into the T&Cs with Speedpay. The plain language of the T&Cs makes clear that Speedpay was acting as Defendant's agent.

In sum, Defendant can enforce the Arbitration Agreement in this case. Under the Arbitration Agreement, "any dispute arising from or relating to Service or your Payment(s) shall be resolved by mandatory and binding arbitration." D.E. 17-1 at 9. The instant matter, which involves illegal processing fees paid online or over the phone, certainly is a "dispute arising from or relating to" the payment processing service. *Id.* Accordingly, Defendant may compel arbitration as a party to the Arbitration Agreement. Alternatively, because Plaintiff agreed to arbitration with Speedpay, Defendant's agent, Defendant may compel Plaintiff to arbitrate his claims arising under the Phone Payment Agreement—to hold otherwise would result in "evisceration of the underlying arbitration agreement." *MS Dealer Serv. Corp.*, 177 F.3d at 947.

10

Having determined that Plaintiff and Defendant entered into an enforceable agreement to arbitrate, the Court need not address whether equitable estoppel or other contract law principles would apply to enforce the Arbitration Agreement. *See* D.E. 25 at 9–12.

B.  The Dodd-Frank Act Prohibits Arbitration

Plaintiff argues that the Motion also must fail because even if Defendant were a party to the T&Cs, compelling Plaintiff to arbitrate his claims with his mortgage servicer violates the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376, which prohibits the use of arbitration provisions or pre-dispute waivers of federal statutory causes of action in connection with residential mortgages. 15 U.S.C. § 1639c(e); D.E. 25 at 12. Defendant replies that the Dodd-Frank Act is inapplicable to this case because "[t]here is no prohibition—by statute or otherwise—against an arbitration agreement covering claims arising from a separate agreement to make a payment by phone." D.E. 27 at 14–15.

The subsection of the Dodd-Frank Act prohibiting arbitration, 15 U.S.C. § 1639c(e), states in relevant part:

> (1) In general
>
> No residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration . . . as the method for resolving any controversy or settling any claims arising out of the transaction.
> . . . .
>
> (3) No waiver of statutory cause of action
>
> No provision of any residential mortgage loan or of any extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer, and **no other agreement between the consumer and the creditor *relating to* the residential mortgage loan or extension of credit** referred to in paragraph (1), shall be applied or interpreted so as to bar a consumer from bringing an action in an appropriate district court of the United States, or any other court of competent jurisdiction, pursuant to section 1640 of this title or any other provision of law, for damages or other relief **in**

11

>    **connection with** any alleged violation of this section, any other provision of this subchapter, or any other Federal law.

15 U.S.C. § 1639c(e)(1), (e)(3) (emphasis added). Title 12 C.F.R. 1026.36(h) reiterates that "[a] contract or other agreement for a consumer credit transaction secured by a dwelling . . . may not include terms that require arbitration." 12 C.F.R. 1026.36(h)(1). As to waivers of federal statutory causes of action, the regulations restate that "[a] contract or other agreement relating to a consumer credit transaction secured by a dwelling . . . may not be applied or interpreted to bar a consumer from bringing a claim in court pursuant to any provision of law for damages or other relief in connection with any alleged violation of any Federal law." 12 C.F.R. 1026.36(h)(2).

The issue here is this: Does the Dodd-Frank Act prohibit arbitration when a homeowner agrees with the mortgagor and the payment processor to arbitrate claims arising from an agreement to make a mortgage payment by phone? The Court answers this question in the affirmative.

Courts that have had occasion to consider 15 U.S.C. § 1639c(e) have done so in the context of whether the provision applies retroactively. *See, e.g.*, *Trevisani v. Ocwen Loan Servicing, LLC*, No. 16-cv-63018-BLOOM, 2017 U.S. Dist. LEXIS 220681 (S.D. Fla. May 3, 2017); *Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1079 (D. Colo. 2013); *Beckwith v. Caliber Home Loans*, No. 3:15-cv-00581-RDP, 2015 U.S. Dist. LEXIS 78332 (N.D. Ala. June 17, 2015); *Davies v. Green Tree Servicing, LLC*, 3:14-1711, 2015 U.S. Dist. LEXIS 78772, 2015 WL 3795621 (M.D. Pa. June 18, 2015). In each case, the court decided that § 1639c could not be applied retroactively to arbitration agreements entered into before the Dodd-Frank Act became effective in 2010.[5] *See id.* To the Court's knowledge, no court has addressed the issue presented in this case.

The Court must determine whether Plaintiff has carried his burden to show that Congress

---

[5] Here, the Parties do not address retroactivity. While the subject mortgage here was executed in 2008, before the Dodd-Frank Act became effective, the Phone Payment Agreement containing the Arbitration Agreement was executed in May 2020. D.E. 1 ¶ 16; D.E. 1-1 at 8.

12

intended § 1639c to preclude arbitration of the claims in this action. *See Gilmer*, 500 U.S. at 26; *see also Richards v. Gibson*, No. 1:15CV7-LG-RHW, 2015 U.S. Dist. LEXIS 10365, 2015 WL 403050, at *3 (S.D. Miss. Jan. 29, 2015).

"As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002). "We do this because we presume that Congress said what it meant and meant what it said." *Id.* (quotation marks omitted). "Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Med. Transp. Mgmt. Corp. v. Comm'r of IRS*, 506 F.3d 1364, 1368 (11th Cir. 2007) (quotation marks omitted). However, "[w]e will . . . look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if . . . the statute's language is ambiguous." *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010) (quotation marks omitted). "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation." *Med. Transp. Mgmt. Corp.*, 506 F.3d at 1368. Where there can be more than one reasonable interpretation, "the courts are left to determine [the statute's] meaning by looking to the legislative history and employing the [other] canons of statutory construction." *U.S. Steel Mining Co. v. Dir., OWCP*, 719 F.3d 1275 (11th Cir. 2013). "Congress is presumed to know the content of existing, relevant law, and . . . where Congress knows how to say something but chooses not to, its silence is controlling." *Griffith v. United States*, 206 F.3d 1389, 1394 (11th Cir. 2000) (quotation marks, citations, and alterations omitted). "An express statutory exclusion of pre-dispute arbitration undoubtedly constitutes a clear congressional command." *Jackson v. Home Team Pest Def., Inc.*, No. 6:13-cv-916-ORL-22TBS, 2013 U.S. Dist. LEXIS 163269, 2013 WL 6051391, at *8 (M.D. Fla. Nov. 15, 2013).

Under the Dodd-Frank Act, Plaintiff is a "consumer," Defendant is a "creditor," and the subject mortgage is a "residential mortgage loan." First, a consumer "is a natural person, and the money, property, or services which are the subject of the [credit] transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i); *see also* 12 C.F.R. 1026.2(11). Plaintiff is a consumer: Plaintiff is a natural person, and the subject mortgage is for a residential home. D.E. 1 ¶ 13; D.E. 1-1 (copy of mortgage). Second, a creditor is one who "both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(g); *see also* 12 C.F.R. 1026.2(17). Defendant is a creditor: "Carrington is a mortgage servicer specializing in high-risk, high-interest residential loans," the subject loan is payable in more than four installments, and while the mortgage indicates that Security Atlantic Mortgage Co. is the lender, the parties do not dispute that Plaintiff's mortgage payments are payable to Defendant by agreement. D.E. 1 ¶ 1; D.E. 1-1 at 1–2. Third, a "residential mortgage loan" means "any consumer credit transaction that is secured by a mortgage . . . interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602(dd)(5). "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." § 1602(f). The subject mortgage is a residential mortgage loan: Plaintiff, the consumer, obtained a loan on credit, and the loan is secured by a mortgage security interest in the subject residential real property.

The Court finds the statutory language to be clear and unambiguous. Making a payment on a residential mortgage loan certainly "relate[s] to the residential mortgage loan." § 1639c(e)(3); 12

C.F.R. 1026.36(h)(2). While Section 1639(e)(1) and the first clause of Section 1639c(e)(3) limit arbitration prohibition to "any residential mortgage loan . . . secured by the principal dwelling of the consumer," the second clause of Section 1639c(e)(3) does not contain such a limitation; rather, the second clause of Section 1639c(e)(3) includes the broad phrase "agreement[s] . . . relating to" residential mortgage loans or extension of credit. The text of the statute applies broadly to "agreement[s] . . . relating to" residential mortgage loans, not strictly to residential mortgage loans themselves. § 1639c(e)(3).

Defendant cites to *CMH Homes, Inc. v. Sexton*, 441 F. Supp. 3d 1202, 1209 (D.N.M. 2020) in support of its position that the law does not prohibit an arbitration agreement covering claims arising from a separate agreement to make a mortgage payment by phone. D.E. 27 at 10; *CMH Homes, Inc.*, 441 F. Supp. 3d at 1209 (granting motion to compel arbitration and finding that a separate sales transaction was distinct from a mortgage transaction). But the facts in *CMH Homes* are distinguishable. In *CMH Homes*, the plaintiff-debtor purchased a new "model manufactured home" from the defendants-manufacturers and sued the defendants on the grounds "that they sold him a severely defective manufactured home and stood by as it developed a dangerous mold infestation." *Id.* at 1204–07. Presumably because the plaintiff did not bring a single federal statutory cause of action, *id.* at 1207, the Court did not consider whether the plaintiff sued in relation to a residential mortgage loan or extension of credit under Section 1639c(e)(3) and instead focused its analysis solely on Section 1639c(e)(1).

In this case, because Defendant, the creditor/biller, is a party to the T&Cs, it is a party to the "agreement between the consumer and the creditor relating to the residential mortgage loan." § 1639c(e)(3). The consumer (Plaintiff) and the creditor (Defendant) entered into an agreement, the Phone Payment Agreement, which relates to the residential mortgage loan. § 1639c(e)(3).

15

Although Defendant zealously contends it is a party to the Arbitration Agreement, Defendant does not want to treat the T&Cs as an "other agreement between the consumer and creditor relating to the residential mortgage loan or extension of credit" that would be covered by the Dodd-Frank Act's arbitration prohibition. *Id.* But the Court will not allow Defendant to use the Arbitration Agreement as a sword and a shield. Because the Defendant is a creditor regulated by Dodd-Frank it cannot bar Plaintiff from pursuing his federal claim in this Court.

Lastly, Defendant replies that even if the Dodd-Frank Act applied to the Phone Payment Agreement, Section 1639c(e)(3) prohibits arbitration agreements that govern asserted violations of federal law and is therefore inapplicable to Plaintiff's four state law claims. D.E. 27 at 10. However, Section 1639c(e)(3) provides that no agreement relating to a residential mortgage loan shall bar a consumer from his day in federal court from an action "*in connection with*" any violation of federal law. § 1639c(e)(3) (emphasis added). Plaintiff's sole federal cause of action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(2)(b), in which he alleges that Defendant violated the statute because it had no legal right to seek collection of any "processing fees" from Plaintiff or other putative class members. D.E. 1 ¶¶ 31–40. Each of Plaintiff's claims stem from his allegation that Defendant charged illegal mortgage payment processing fees that were not expressly authorized by his mortgage. *See id.* ¶¶ 48, 59, 64, 68. The Court finds that Plaintiff's state law claims are sufficiently connected with his federal statutory claim that Plaintiff may pursue them in this lawsuit.

### IV. Conclusion

In sum, Defendant is a party to the Arbitration Agreement, which is prohibited by 15 U.S.C. § 1639c(e)(3). Accordingly, it is hereby

ORDERED AND ADJUDGED that the Motion to Compel Arbitration and to Stay Case, D.E. 17, is DENIED. It is further

ORDERED AND ADJUDGED that the Motion to Stay Discovery, D.E. 18, is DENIED AS MOOT. It is further

ORDERED AND ADJUDGED that Defendant SHALL file its response to the complaint within fourteen (14) days of this order. It is further

ORDERED AND ADJUDGED that the hearing scheduled for Friday, September 18, 2020, is CANCELED and RE-SET to Friday, October 30, 2020, at 10:00 a.m.

DONE AND ORDERED in Chambers at Miami, Florida, this _15th_ day of September, 2020.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc: all counsel of record via cm/ecf